IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 11-40606-pwb |
| | : | |
| CHARLES DANIEL MCALLISTER, and | : | CHAPTER 13 |
| FRANCIS DIANE MCALLISTER, | : | |
|     Debtors. | : | JUDGE BONAPFEL |
| | : | |
| CHARLES DANIEL MCALLISTER, and | : | ADVERSARY PROCEEDING |
| FRANCIS DIANE MCALLISTER, | : | |
|     Plaintiff, | : | CASE NO. _____ |
| | : | |
| v. | : | |
| | : | |
| CITIMORTGAGE, INC., | : | |
| | : | |
|     Defendant. | : | |

**COMPLAINT TO DETERMINE EXTENT OF LIEN AND FOR DAMAGES**

COME NOW, Charles Daniel McAllister and Francis Diane McAllister ("Plaintiffs"), file this Complaint to Determine Extent of Lien and for Damages (the "Complaint") against CitiMortgage, Inc. ("Defendant"), and shows this Court as follows:

**JURISDICTION**

1. Jurisdiction of this adversary proceeding is proper under 28 U.S.C. § 1334. Venue is proper under § 1409 as this is the same district as Plaintiff's pending bankruptcy case. This is a core proceeding under § 157.

**BACKGROUND**

2. Plaintiffs are the debtors in the above-captioned Chapter 13 bankruptcy case that commenced on February 28, 2011.

3. Plaintiffs own certain real property, as listed on his bankruptcy schedules, located at 280 Wagner Dr., Dalton, GA 30721 (the "Property") and described as:

> "All that tract or parcel of land lying and being in Land Lot No. 290 in the 12th District and 3rd Section of Whitfield County, Georgia, and describe as follows: Beginning at an iron pin on the southerly side of Mary Drive, formerly the Old Antioch Wagon Road, 815 feet eastwardly along the southerly side of Mary Drive and an extension thereof from its intersection with the center line of Hill Road; thence south 89 degrees 6 minutes east along the southerly side of Mary Drive and the Old Antioch Wagon Road 298.57 feet to an iron pin; thence south 0 degrees 12 minutes east 361.40 feet to an iron pin; thence north 89 degrees 48 minutes west 299.77 feet to an iron pin; thence north 365 feet to the point of beginning."

4. Plaintiffs first bought the Property in May of 1990 and financed this purchase through a mortgage transaction.

5. Around August or September of 1995, Plaintiffs were interested in refinancing their existing mortgage and being able to purchase a tractor trailer for Mr. McAllister's employment.

6. Around this same time, Plaintiffs walked into an office of Associates Financial Services of America, Inc. ("ASF") located next to the Walmart at 2545 E. Walnut Ave., Dalton, GA. Plaintiffs met with an agent of ASF, which to the best of their recollection could be described as a young blonde haired woman, and discussed a refinance.

7. At the office of ASF, Plaintiffs executed a "Loan Agreement" dated September 1, 1995 whereby Plaintiffs borrowed money in the principal amount of $71,246.99, which includes a loan fee of $6,476.99, from Associates Financial Services of America, Inc. ("ASF") in exchange for 1 payment in the amount of $1,018.99 and 179 monthly payments in the amount of $937.29 with the final payment due on September 10, 2010 (the "Note"). A true and correct copy of the Note is attached and incorporated as Exhibit "A."

2

8. Plaintiffs also executed a "Deed to Secure Debt" dated September 1, 1995 that secured the Note against the Property and was recorded on September 6, 1995 at deed book 2649, pages 219-221 in the Superior Court of Whitfield County, GA (the "Security Deed").

9. In the initial months after executing the Note and Security Deed, Plaintiffs received regular monthly bills from ASF and made regular payments under the Note via personal checks directly to ASF at the aforementioned ASF office.

10. Upon information and belief, the young blonde haired woman became a manager at ASF.

11. Upon information and belief, the young blonde haired woman soon after ceased employment with ASF or possibly changed office locations.

12. Plaintiffs' best recollection is that the new manager could be described as a man of Asian heritage, in his thirties, and of average height (the "New Manager").

13. Plaintiffs continued to receive regular monthly bills and make regular monthly payments directly to the ASF office until the spring or summer of 1996.

14. In the spring or summer of 1996, Mr. McAllister had a truck accident. This accident left Plaintiffs without significant income for two months.

15. Plaintiffs spoke to the New Manager about this issue and their inability to pay on the Note for two months. The New Manager promised that the missed payment could be extended[1] without interest or penalty to Plaintiffs, by moving the payment to the end of the Note.

16. Plaintiffs accepted this offer and relied on this promise in making their next regular monthly payment. ASF accepted that payment.

---

[1] According to the FDIC, an extension of a closed-end credit agreement involves deeming the loan current and extending the maturity date. This is slightly different from a deferment, whereby payments are postponed, but interest continues to accrue and the maturity date is note extended.

3

17. Shortly after this, Plaintiffs recalling falling one month behind on payments. Plaintiffs used their 1995, or possibly 1996, tax refund to pay two payments at once along with the applicable late fee. The New Manager assured them everything was alright.

18. Plaintiffs continued making regular monthly payments and proactively added in the $25 late fee, if they were making the payment late.

19. Around the end of 1997, Mr. McAllister had a second truck accident. This accident left Plaintiffs without significant income for one month.

20. Plaintiffs spoke to an agent for ASF over the phone and requested that one payment be extended and tacked on to the end of the Note. The agent agreed and further explained that this was only permissible because Plaintiffs were otherwise current.

21. Plaintiffs accepted this offer and relied on this promise in making their next regular monthly payment. ASF accepted that payment.

22. At sometime around the second accident, Plaintiffs went in to ASF's office to make a payment and were informed that they now needed to mail payments to an address in Texas and payable to Defendant.

23. Plaintiffs proceeded with making payments via personal check to the address in Texas.

24. Upon information and belief, Plaintiffs may have been delinquent at the time Defendant acquired ASF's interest in the Note.

25. Concurrently with the change in payee and the address to send payments, Plaintiffs stopped receiving monthly bills or statements.

26. From 1998 and onward, Plaintiffs continued to make payments to Defendant and at some point the ASF office closed and reopened under the name "CitiFinancial."

27. About once or fewer times per year the Plaintiffs recall falling behind on Note payments when Mr. McAllister's work was slow. Each such occurrence, Plaintiffs would later make multiple payments at once, along with the applicable late fee, after Mr. McAllister's work and income increased.

28. Around sometime in 2005 or 2006, Plaintiffs began receiving mortgage statements from Defendant. Mrs. McAllister believed that the one large number on the bill was the amount *originally* borrowed.

29. Plaintiffs continued to make payments to Defendant.

30. As time went on, Mrs. McAllister, who primarily wrote the payment checks and sent in the payment, became increasingly concerned after realizing that the one large number on the bill from Defendant was changing.

31. In April 2009, Plaintiffs contacted Defendant regarding their concern over the information on the mortgage statements. Defendant represented that the large number on the statement was the amount still outstanding on the Note, which approached the amount originally borrowed. Plaintiffs expressed their disbelief and explained to Defendant that is was impossible for them to still owe so much. This was the first time Plaintiffs realized the magnitude of the problem.

32. Plaintiffs continued to make monthly payments to Defendant and engaged in periodical arguments over the phone regarding the balance on the Note.

33. Plaintiffs believe they may have fallen one to two monthly payments behind during the months leading up to the maturity of the Note.

34. The Note was originally set to mature on September 10, 2010, subject to the extensions granted by ASF. Plaintiffs made two additional monthly payments after this date in

   October and November of 2010 for potential missed payments. At this point, Plaintiffs assert they had completed all payments, except for the three extended payments identified *supra*.

35. On or about November 10, 2010, Plaintiffs sent a written request to Defendant identifying themselves and the Note. The request stated that the balance was incorrect and asked for assistance. Defendant responded without any explanation, clarification, or identification of a person to call regarding the Note. Instead, Defendant enclosed some of the payment history on the Note.

36. Defendant misapplied payments under the terms of the Note.

37. Defendant improperly charged late fees under the terms Note.

38. Defendant improperly calculated interest under the terms of the Note.

39. Plaintiffs paid for and suffered financial loss due to Defendant's payments misapplication, improper late fees, and improper interest calculation.

40. After further arguments with Defendant's representatives, Plaintiffs turned to Chapter 13 bankruptcy to address this and their other financial obligations.

41. Defendant recently recorded an assignment of the Security Deed on July 26, 2011 in deed book 05624, page 0081 in the Superior Court of Whitfield County, GA, whereby ASF assigned its interest in the Security Deed to Defendant.

42. Defendant has not appeared by an attorney in the underlying chapter 13. Defendant has filed a proof of claim (#8 on the register) in the total amount of $60,184.55. Incredibly, Defendant purports this to be the balance on the Note, which had an original principal amount of $71,246.99, after fifteen years of payments on a fifteen year mortgage.

43. Defendant is a New York corporation authorized to transact business in Georgia. Its registered agent in Georgia is "C.T. Corporation System 1201 Peachtree Street, NE, Atlanta, GA  30361."

## RELIEF REQUESTED

44. Plaintiffs request a judgment determining the outstanding principal balance, the interest balance, and late fee balance, as of the date of Plaintiffs' underlying bankruptcy petition.

45. Plaintiffs request a judgment that Defendant is liable to Plaintiff for actual damages, statutory damages, costs, and attorney's fees for breach of contract and violation of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p ("FDCPA") and the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601-2617 ("RESPA").

## BASIS FOR RELIEF

46. Actions to determine the extent, validity, or priority of a lien are specifically to be brought as adversary proceedings under Fed. R. Bankr. P. 7001(2). Objections to claims may be combined with matters designated for adversary proceedings under Fed. R. Bankr. P. 3007(b).

47. The determination of the balance of the Note, and the extent of Defendant's lien on the Property, is essential to administration of the estate and confirmation of a plan in Plaintiffs' underlying chapter 13 bankruptcy case.

48. Therefore, it is necessary and proper for this Court to adjudicate the balance of the Note and Defendant's proof of claim.

49. An inseparable element to determining the balance of the Note is whether Defendant breached its terms.

50. Defendant breached the terms of the Note when Defendant misapplied payments, improperly charged late fees, and improperly calculated interest.

51. Plaintiffs paid for and suffered financial loss due to Defendant's payments misapplication, improper late fees, and improper interest calculation.

52. Defendant's actions also trigger liability under FDCPA.

53. Defendant is subject to FDCPA because Defendant may have assumed ASF's interest in the Note at a time when Plaintiffs were delinquent. *See Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534 (7th Cir. 2003) (holding that an entity is subject to FDCPA where it acquires debts that it believes are delinquent).

54. Defendant violated FDCPA § 1692(e)(2) for false or misleading representations regarding the character and amount of the Note and § 1692(f)(1) for attempting to collect amounts not authorized under the Note.

55. Plaintiffs are entitled to judgment against Defendant for actual damages, statutory damages in the amount of $1,000, costs, and attorney's fees under FDCPA § 1692(k).

56. Defendant violated RESPA § 2605(e)(2) for failing to take proper action in response to Plaintiffs' qualified written request and § 2605(i)(3) for improper payment application.

57. Plaintiffs are entitled to judgment against Defendant for actual damages, statutory damages in the amount of $1,000, costs, and attorney's fees under RESPA § 2605(f).

**WHEREFORE**, Plaintiff respectfully requests that the Court enter a judgment determining the outstanding balance on the Note and awarding Plaintiffs actual damages, statutory damages, costs, attorney's fees, and such other relief as the Court deems just and proper.

Respectfully submitted: August 29, 2011                    THE HURTT LAW FIRM, LLC

*/s/ Michael D. Hurtt*
Michael D. Hurtt
Georgia Bar No. 380112
mikehurtt@windstream.net

*/s/ David W. Johnson*
David W. Johnson
Georgia Bar No. 940310
davidjohnson5@windstream.net
Attorneys for Plaintiffs
PO Box 1304
Dalton, GA 30722-1304
(706) 226-5425

EXHIBIT "A"

NOT 1120342918

**Loan Agreement**
(SECURITY AGREEMENT)

GEORGIA
1ST & 2ND MORTGAGE

LENDER:
ASSOCIATES FINANCIAL SERVICES OF AMERICA, INC
2191 2535 E WALNUT AVENUE J10 DALTON    GEORGIA

BRANCH CODE, STREET ADDRESS, CITY AND STATE

| ACCOUNT NUMBER | DUE | LOAN DATE | | LAST PAYMENT DATE | | | | |
|---|---|---|---|---|---|---|---|---|
| 0315638 | 10 | 09/01/95 | | 09/10/10 | | | | |
| BORROWER | | | FEES | | LOAN FEE (1) | INTEREST (2) | (1)+(2)=(3) | FINANCE CHARGE |
| MCALLISTER, CHARLES D | | | $.00 | | 6476.99 | 97546.91 | 104023.90 | |
| 280 WAGNER DRIVE | | | CREDIT LIFE INS. PREM. | CREDIT A&H INS. PREM. | | | AMOUNT FINANCED (4) | |
| DALTON | | | $.00 | $.00 | | | 64770.00 | |
| GA 30721 | | | I.I. | | PRINCIPAL BALANCE (1)+(4) | | TOTAL OF PAYMENTS (3)+(4) | |
| | | | $.00 | | 71246.99 | | 168793.90 | |
| PAYMENT SCHEDULE - PAYMENTS ARE PAYABLE MONTHLY | | | | | | | 1ST PAYMENT DATE | |
| 180 PAYMENTS  1 AT $ 1018.99  FOLLOWED BY 179 AT $ 937.29  FOLLOWED BY 0 AT $ .00 | | | | | | | 10/10/95 | |
| CO-BORROWER (SPOUSE) | | | | CO-BORROWER (NON-SPOUSE) | | | | |

☒ AGREED RATE OF INTEREST: ___13.76___ % per year on the unpaid principal balance.

☐ AGREED RATE OF INTEREST: THIS IS A VARIABLE INTEREST RATE LOAN AND THE INTEREST RATE WILL INCREASE OR DECREASE WITH CHANGES IN THE BANK PRIME LOAN RATE. The interest rate will be _____ percentage points above the "Bank Prime Loan Rate" published in the Federal Reserve Board's Statistical Release H.15. The initial Bank Prime Loan rate is _____ %, which is the published rate as of the last business day of _____; therefore, the initial interest rate is _____ % per year. The interest rate will increase or decrease with changes in the Bank Prime Loan rate when the Bank Prime Loan rate, as of the last business day of the preceding month, has increased or decreased by at least 1/4th of a percentage point from the Bank Prime Loan rate on which the current interest rate is based. The interest rate cannot increase or decrease more than 2% in any year. In no event, however, will the interest rate ever be less than _____ % per year, nor more than _____ % per year. The interest rate will not change before the First Payment Date. Interest will be computed on the unpaid principal balance.

Adjustments in the Agreed Rate of Interest shall be given effect by changing the dollar amounts of the remaining monthly payments in the month following the anniversary date of the loan and every 12 months thereafter so that the total amount due under this Loan Agreement will be paid by the last payment date. Associates waives the right to any interest rate increase after the last anniversary date prior to the last payment due date of the loan.

**REPAYMENT**   I promise to pay you at your office the principal balance together with interest figured at the Agreed Rate of Interest checked above until fully paid.

I will repay my loan by making the monthly payments set forth in the Payment Schedule. Payments will be made every month beginning on the first payment date stated above until the loan is fully paid. If there is no such date in any month that follows, payment will be made on the last day of that month.

Each payment I make will be applied first to interest owed to the date of payment and remainder to principal balances.

I agree to pay interest after maturity at the Agreed Rate of Interest.

**LATE CHARGES**   If any payment is more than 10 days past due, I agree to pay a late charge in an amount equal to 5% of the payment, but not more than $25.00.

**DEFAULT**   I will be in default if I fail to pay any payment or part of a payment on time or if I default on any of the terms of any security agreement or Deed To Secure Debt which secures my loan.

If I default, you have the right to declare the entire unpaid amount of my loan immediately due and payable without giving me notice of the default or asking me to pay. If this loan agreement is secured by a mobile home, I will be given a notice of right to cure a default if I am entitled to this notice. In the event of default, I will receive a pro rata rebate of the unearned insurance premiums. If you declare the balance of my loan due and payable, you have the rights and remedies provided for in any security agreement or Deed To Secure Debt that secures this loan, including the right to require me to pay any deficiency.

**PREPAYMENT**   I have the right to pay in advance at any time. If I prepay in full, I will pay the principal balance remaining unpaid as of the date of prepayment plus accrued interest. If I prepay in full, whether by refinancing or otherwise, within 12 months of the date of this loan, I will receive a pro rata rebate of the loan fee, calculated as of the date of prepayment by pro rating the fee over the first 12 months of the loan. This means that you will earn 1/12 of the loan fee each month over the first 12 months of the loan, and the loan fee will be fully earned at the end of 12 months, subject to the "Maximum Yield Upon Prepayment" paragraph, below.

**MAXIMUM YIELD UPON PREPAYMENT**   It is agreed that the total of the interest, loan fee, and prepayment penalty payable by me on my loan shall in no event exceed the equivalent of a rate of interest greater than 5% per month computed in accordance with Section 7-4-18, official Code of Georgia Annotated, 1982. Therefore, if I prepay this loan, if necessary, you will reduce, waive or refund the loan fee and the prepayment penalty in the amount required so that your yield on this loan does not exceed 5% per month. This is the case regardless of whether my prepayment is voluntary or otherwise.

**PREPAYMENT PENALTY**   Subject to the "Maximum Yield Upon Prepayment" paragraph, above, if real estate is given as security for this loan and if an amount in excess of 20% of the original principal balance is prepaid in any 12-month period within 5 years of the loan date, I agree to pay a prepayment penalty in an amount equal to 6 months interest on the amount prepaid in excess of 20% of the original principal balance.

If this loan is secured solely by residential real estate the Alternative Mortgage Transaction Parity Act of 1982 governs certain provisions of this loan.

NOTICE: SEE OTHER SIDE FOR ADDITIONAL PROVISIONS WHICH BORROWER AGREES TO, WHICH CONSTITUTE A PART OF THIS AGREEMENT.

I acknowledge receipt of a completely filled-in copy of this loan agreement.

_____S. Hurr_____ (WITNESS)

_____Charles D McAllister_____ (BORROWER)

_____ (BORROWER)

I am not personally liable for this loan but I give you a security interest in the property described above to assure payment of this loan.

_____Francis D McAllister_____

ORIGINAL (1)
BORROWER COPY (1)
CO-BORROWER COPY (1)

003002 REV. 5-94

## STATEMENT OF ADDITIONAL PROVISIONS

**ATTORNEY CHARGES**  I will pay court costs and reasonable attorney's fees not in excess of 15% of the principal and interest owing on the indebtedness if you hire an attorney to: (1) collect this loan; (2) protect your interest in the property I have given to assure payment of this loan.

**DELAY IN ENFORCEMENT**  You can delay enforcing your rights under this loan agreement without losing them. If I default in complying with any of the terms of my loan and you do not declare the loan balance immediately due and payable, this does not mean you cannot do so in the future if I default again.

**SECURITY**  This loan agreement is secured by a Deed To Secure Debt of even date.